### Dolese & Shepard Co. v. Charles Johnson.
#### Gen. No. 11,491.

1.  FELLOW-SERVANTS—*who are.*  Where the duties of servants of a common master are such as to require their habitual association, so that they can exercise over each other an influence promotive of proper caution, they are fellow-servants.

2.  FELLOW-SERVANT—*what does not render master liable for negli-*

Dolese & Shepard Co. v. Johnson.

*gence of.* The negligence of a fellow-servant which contributed to the injury forming the basis of the suit, cannot be attributed to the master merely because he enjoined such servant to be careful.

BALL, J., dissenting.

Action on the case for personal injuries. Appeal from the Superior Court of Cook County; the Hon. RUSSELL P. GOODWIN, Judge, presiding. Heard in this court at the October term, 1903. Reversed. Opinion filed October 4, 1904.

F. J. CANTY and E. E. GRAY, for appellant; J. C. M. CLOW, of counsel.

EDDY, HALEY & WETTEN, HUGH R. STUART and HARRY OLSON, for appellee; CHARLES H. PEGLER, of counsel.

MR. JUSTICE ADAMS delivered the opinion of the court.

Appellee recovered a judgment for the sum of $1,500 against appellant, in an action for personal injuries, from which judgment this appeal is taken.

The appellant is engaged in the business of preparing and selling crushed stone. It procures the stone from a quarry which it owns. This quarry forms quite an extensive pit in the ground, formed by the continual excavating of the rock. The bottom of the pit or quarry is probably twenty or thirty feet below the surface of the ground. A building, containing the machinery with which the rock is ground up or crushed, stands on the original level of the ground, near the edge of the quarry. This building is known as the " crusher." From this building a track extends down an incline to the bottom of the quarry. From about the point where this track reaches the bottom of the quarry, several tracks branch out or radiate like the spokes from a wheel hub, these branch tracks reaching different parts of the quarry and extending to the face of the rock. It appears from the testimony that at the time of the accident there were eight of these branch tracks. Over these tracks cars loaded with stone were hauled up to the crusher, and returned when emptied. These cars were about five feet wide, seven feet long, twenty inches high inside, and about thirty-six inches from the top of the rail to the top

of the car.  The rock is broken down from the face of
the quarry by blasting.  It is then further broken up and
loaded into these cars.  As the work progresses, the face
of the rock gradually becomes further away from the
*termini* of these tracks, and so, as occasion requires, the
tracks are extended so as to run up to the face of the rock.
On account of the nature of the work, these tracks are
changed and repaired and extended continually.  The rock
thrown out by the blast forms an irregular pile of broken
rock on the bottom of the quarry at the foot of the face.
The men who load the cars work on these piles.  Frequently
fragments of rock in these piles are so large that they must
be broken again before they can be loaded into the cars.
There were several gangs loading cars at about this time,
about one gang for each of the tracks, which would make
eight gangs working in the quarry at the time, loading
rock into cars.  It was the business of the plaintiff to take
care of these tracks and shift them and extend them as the
work of the gangs required.  The foreman of the quarry
directed him, that he should repair the track whenever the
men working at loading the stone called upon him so to do.
He did the work of extending and shifting the tracks for
all of these different gangs.  This practically took up his
entire time.  At the time in question a man in one of these
gangs had notified the plaintiff that they had cleared up
the rock for such a distance from the end of their track as
to make an extension of it necessary.  Upon being so noti-
fied, the plaintiff came to the track and looked at it.  He
then stepped away a short distance to get his tools.  At
that time a car loaded with stone was standing at the end
of the track, and while plaintiff stepped away to get his
tools, the gang shoved this car out on the track for some
distance to get it out of the plaintiff's way, so that it would
not interfere with him in his work of extending the track.
The plaintiff started in on his work of making this track
to suit the wishes of the gang, and Smith, one of the gang,
went to working or prying at the stone pile with a crowbar.
Plaintiff says that at that time he was working at one of

the rails. A rail is about fourteen feet long. He was working at the end of the rail furthest from the pile, and was about fourteen feet away from the pile. In some way or other Smith loosened one of the rocks, weighing about 500 or 600 pounds, from the pile, and it rolled down and struck the end of this rail nearest the pile, causing the other end of it to fly up and strike Johnson in the forehead. The men composing these gangs had been instructed by a previous general order of the superintendent of the defendant not to work on the stone pile and throw down rock while the track repairer would be fixing the tracks.

Appellee testified: "I had put this track down, originally. When Welch came to me and asked me to fix it I took my tools and started to fix it; I don't remember if I looked it over first; I started in to fix it, and I didn't pay any attention to the men that were working around there; I knowed they had been working there, and that it was their duty to load cars and bar stone down from the pile, and I knew they used crowbars to bring the big rock down with; I had seen them working there in that way for eight months, and I knew how the work was done; I don't remember whether I was standing in the middle of the track or was standing on the side of it; I had my face to the stone pile, and my back to— my back faced to the stone pile."

The following named witnesses for appellee testified as follows:

William Kempert: "He did come there first and looked the track over and then went off and got his tools; we shoved the car off and he was going to fix the track; he had been there before he got hurt, and looked the situation over. Smith had been upon the pile two or three minutes before the rock fell. Smith helped shove the car out, and then he went upon the pile of stone; I saw that, and then I saw Johnson come to fix the rail."

Q. "How long after you saw Smith go upon the pile and commence work was it that Johnson came to fix the rail?" A. "Johnson was there first, and then Smith

went up; before Johnson commenced to fix the rail. Smith had been upon the pile about three minutes. Johnson and Smith worked in that position about three minutes before the rock fell. Smith had been working there barring down stone, and Johnson had been working on the tracks, for four weeks. I had worked in the quarry about six weeks, altogether; there were other men there doing the same kind of work I was doing. We used our own judgment about throwing rock down, so as not to hurt anybody. We did the best we could not to hurt anybody, and we used our judgment as to when or when not to roll rock down, and if we thought there was anybody close enough to the pile to be hurt we would not roll rock down, and if we thought there was no danger in rolling the rock down we would roll it down. This pile was about eight or ten feet high. In rolling a heavy rock down it would stay right at the bottom of the pile, and if we saw a man twenty or twenty-five feet away from the pile, we didn't consider anything wrong about rolling a rock down; we considered it safe enough when the man was twenty or twenty-five feet away from the pile." This witness also testified : " We were supposed to be standing around doing nothing. * * * Johnson was about fourteen feet away; it was broad daylight; Johnson could have seen the men on the pile of stone if he had looked. * * * We had orders from Peterson not to throw any stone down when Johnson was working at the bottom of the pile; that is, when he was right underneath the pile; but at this time he was fourteen feet away."

John Welch : " After we had loaded the car we pushed it out from the pile of stone, and I called Mr. Johnson to come and fix the track; he went to fix the track, and a man by the name of Smith was on the pile of rock and he rolled down a stone, and it struck the rail and the rail tipped up and hit him in the head." On cross-examination the witness testified : " I am sure, after this car was moved away, Smith went upon the pile, and Johnson went to work upon the rail about two or three minutes after Smith went upon the pile. Smith went upon the pile and commenced to bar

down stone after we got the car out and before the rail was fixed or before Johnson started to fix the rail; I am positive of that; I was about twenty feet from Johnson; Kempert and I were side by side; Johnson was about twelve feet from the pile. We moved the car out of Johnson's way before I called his attention to the track; he was working on the next track to it when I called him, about nine feet away; we had been working at that pile of stone all morning, and Johnson had been working all morning at the track, about eight feet away. I had known Johnson in that quarry about six months; we had all been doing that same kind of work all that six months; we were working piece work, and Johnson day work. There was a broken tie under this rail, under the joint of the rail, twelve feet from the pile; the broken tie was about four feet from the pile; it was the tie nearest to the pile; I suppose Johnson placed the rail there originally; that was his work."

Q. "That was his business, to watch those rails, wasn't it?" A. "Yes, sir; when Johnson came to fix the rail, he came facing the pile of stone; when Johnson fell, Smith was the only man on the pile. It was customary for the men to keep on with their work of shoveling stone, when the rails were being fixed, if they were some distance from the pile." On redirect, he testified: "Well, I say that Smith was on the pile before Johnson went to fix the track."

At the conclusion of the plaintiff's evidence, and also at the conclusion of all the evidence, appellant's attorney moved the court to instruct the jury to find the defendant not guilty, and presented to the court an instruction to that effect, which the court refused. After carefully considering all the evidence, we cannot avoid the conclusion that, whether appellee and Smith were, or were not, directly cooperating in the particular work, their duties were such as to require habitual association, so that each could exercise an influence over the other promotive of proper caution, and, therefore, that they were fellow-servants. Pagels v. Meyer, 193 Ill. 172, 179; Chicago City Ry. Co. v. Leach, 208 ib. 198, 207.

We are strongly inclined to the view that appellee and the different gangs of men working in the quarry were directly cooperating in the particular work; that, by the united efforts of appellee and those men, the stone was taken from the quarry. It was not necessary, however, that they should have been so directly cooperating, to constitute them fellow-servants. It is enough that their duties were such as to bring them into habitual association.

In Pagels v. Meyer, *supra*, the court say : "If they are brought together by directly cooperating with each other in a particular work at the time of the injury, or are by their usual duties brought into habitual association, they have the opportunity and power to influence each other to the exercise of caution by example and advice and by reporting delinquencies to the employer, and are fellow-servants."

Counsel for appellee argue that the accident was caused by the negligence of Smith in disobeying the instruction of the foreman not to throw down stones while the track was being repaired, and that appellee had the right to rely on the observance of the instruction, and, therefore, that appellant is liable. "The negligence of fellow-servants is one of the ordinary perils of the service, which one takes the hazard of entering into, in any employment." C., B. & Q. R. R. Co. v. Avery, 109 Ill. 314, 322.

In Valtez v. O. & M. Ry. Co., 85 ib. 500, 502, it is said: "This is not unlike the case of Chicago & Alton Railroad Co. v. Murphy, admx., 53 Ill. 336. It was there said: 'Where the ordinary duties and occupations of the servants of a common master are such that one is necessarily exposed to hazard by the carelessness of another, they must be supposed to have voluntarily taken the risk of such possible carelessness when they entered the service, and must be regarded as fellow-servants.' It is certainly not the law that a master is liable to a servant for the negligence of a fellow-servant, on the ground that the master had enjoined the latter to be careful." In the Valtez case, last cited, it appears, from the opinion, that the plaintiff was one of a

repair gang, and the person in charge of the gang directed a certain car to be placed on the dead track, and that the plaintiff, while engaged in obeying the instruction, was injured, the cause of his injury being that the driver of a switch engine mistook the signal of the yard master. The court held that the driver and the plaintiff were fellow-servants.

Our opinion being that appellee and the members of the gangs employed in getting stone from the quarry were fellow-servants, and that the court should have taken the case from the jury, we omit reference to other questions discussed by appellant's counsel.

The judgment will be reversed.

*Reversed.*

Mr. Justice BALL, dissenting.